RDERED in the Southern District of Florida on ___21 August 2009.___

A. Jay Cristol, Chief Judge Emeritus
United States Bankruptcy Court

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

In re

MAURY ROSENBERG,

      Alleged Debtor.

_____/

Case No. 09-13196-BKC-AJC

Involuntary Chapter 7

## ORDER AND MEMORANDUM OPINION GRANTING MOTION OF ALLEGED DEBTOR MAURY ROSENBERG TO DISMISS INVOLUNTARY CHAPTER 7 BANKRUPTCY CASE

THIS MATTER came before the Court on April 20, 2009 at 11:00 a.m. on the Motion to Dismiss Involuntary Chapter 7 Bankruptcy Case ("Motion to Dismiss") filed by Alleged Debtor, Maury Rosenberg ("Alleged Debtor" or "Rosenberg"). The Court, having reviewed the pleadings filed in this case, together with the deposition transcripts and other exhibits submitted by the parties into evidence, having heard argument of counsel, and otherwise being fully advised in the premises,

**FINDS AND DETERMINES** as follows:

# I.    RELEVANT FACTS

## A.    Procedural Background

1.    On November 7, 2008 ("Petition Date"), DVI Receivables, XIV, LLC ("DVI XIV"), DVI Receivables XVI, LLC ("DVI XVI"), DVI Receivables XVII, LLC ("DVI XVII"), DVI Receivables XVIII, LLC ("DVI XVIII"), DVI Receivables XIX, LLC ("DVI XIX"), and DVI Funding, LLC ("DVI Funding")[1] (collectively, the "Original Petitioning Creditors") filed an involuntary chapter 7 bankruptcy petition (the "Original Involuntary Petition") against Rosenberg in the United States Bankruptcy Court for the Eastern District of Pennsylvania, Case No. 08-17346 (JKF) (the "Involuntary Case").

2.    On November 10, 2008, the Original Petitioning Creditors amended their Original Involuntary Petition ("First Amended Involuntary Petition"). [Ex. 7].  According to the Original Petitioning Creditors, the First Amended Involuntary Petition was required by the Clerk of the Court to include information relating to the two corporate bankruptcy cases related to this case. [C.P. 77, ¶ 2].[2]

3.    On the Petition Date, the Original Petitioning Creditors also filed involuntary bankruptcy petitions (the "NMI Subsequent Petitions") against National Medical Imaging, LLC ("NMI") and National Medical Imaging Holding Co., LLC ("NMI Holding") [Exs. 84-85],

---

[1]    DVI Funding was one of the six Original Petitioning Creditors in this case.  Ashland Funding, LLC ("Ashland Funding"), however, joined in the Second Amended Involuntary Petition (as defined below) as a party petitioner and DVI Funding did not sign the Second Amended Involuntary Petition. See [Ex. 82]. Ashland Funding claims to have purchased certain assets of DVI Funding in March, 2007, which was 18 months prior to the filing of the Original Involuntary Petition.  Given the timing of the alleged sale of the assets of DVI Funding to Ashland Funding, it is apparent that DVI Funding signed the Original Involuntary Petition when, by its own subsequent admission, it did not own the underlying asset and was not a creditor of Rosenberg.

[2]    The record will be referred to herein by the Court's document number either as "**C.P.** ___", or "**C.P.** ___ [**page number(s) and/or ¶ number(s)**]."   The Alleged Debtor's Trial Exhibits will be referred to as [**Ex.-(exhibit number)**], and the Petitioning Creditors' Trial Exhibits will be referred to as

which are co-guarantors of Rosenberg under that certain Settlement Agreement, dated August 12, 2005, between Rosenberg, NMI, NMI Holding, the NMI LPs (defined below) and Lyon [Exs. 26 and 75] (the "Settlement Agreement").

4.      Months before the transfer of the Involuntary Case to this Court, Rosenberg filed a motion to dismiss the Involuntary Petition pursuant to Rule 1011(b) of the Federal Rules of Bankruptcy Procedure and Rule 12 of the Federal Rules of Civil Procedure ("Motion to Dismiss"), or, alternatively, to transfer venue pursuant to Bankruptcy Rule 1014(a)(2) and Federal Rule 12(b)(3) ("Motion to Transfer Venue").    Subsequently, the Motion to Transfer Venue was granted by agreement of the parties.    By Order dated January 30, 2009, the Involuntary Case was transferred to this Court. [Ex. 64].

5.      Notwithstanding the transfer of venue, the Alleged Debtor's Motion to Dismiss remained pending for final adjudication by this Court.    The issues raised in the Motion to Dismiss and the response filed in opposition by the Original Petitioning Creditors were fully briefed by the parties, with memoranda in support of their respective positions, prior to the Involuntary Case being transferred to this Court.

6.      As a result, on March 2, 2009, the Court entered its Order Setting Hearing, [C.P. 6], specially setting a hearing on the Motion to Dismiss.    The Court's Order also provided that "[t]o the extent the [M]otion to [D]ismiss answers the [I]nvoluntary [P]etition, the Court will, at that time, conduct an evidentiary hearing on the answer to the petition."

7.      On March 13, 2009, the Alleged Debtor filed his *Motion of the Alleged Debtor (A) for Clarification or, Alternatively, (B)(1) to Convert the Motion to Dismiss into a Motion for Summary Judgment, or (2) to Bifurcate Issues for Upcoming Evidentiary Hearing Set for April*

---

[Ex.-(exhibit letter)].    Deposition Transcripts will be denoted as **[(date of transcript) (first name initial, last name of witness), (page numbers) (line numbers)]**.

*13, 2009 at 2:00 p.m.* ("Motion for Clarification") [C.P. 22], seeking clarification of the Court's March 2, 2009 Order.

8.     On March 26, 2009, the Court entered an Order on the Motion for Clarification [C.P. 34], procedurally aligning the evidentiary hearing on two critical legal threshold issues - - (i) whether as of November 7, 2008, the Alleged Debtor was indebted to, or owed any monetary obligation to, any of the Original Petitioning Creditors; and (ii) if so, whether (A) each Original Petitioning Creditor holds and owns a separate non-contingent claim against the Alleged Debtor which is not subject to a *bona fide* dispute as to liability or amount pursuant to the eligibility requirements set forth in Section 303(b) of the Bankruptcy Code, or (B) the Original Petitioning Creditors should be considered one consolidated creditor that holds and owns one non-contingent claim against the Alleged Debtor which is not subject to a *bona fide* dispute as to liability or amount pursuant to the eligibility requirements set forth in Section 303(b) of the Bankruptcy Code. [Id.]

9.     After the parties engaged in extensive written discovery and oral examination of various witnesses, the Original Petitioning Creditors amended, for a second time, their Original Involuntary Petition on April 7, 2009 (the "Second Amended Involuntary Petition"). [Ex. 82]. This second amendment changed the amounts originally claimed to be owed to each of the Original Petitioning Creditors, and added Ashland Funding as a new petitioning creditor.  The Second Amended Involuntary Petition was not signed by one of the Original Petitioning Creditors, namely DVI Funding. [Id.]  The Second Amended Involuntary Petition included a copy of a certain Portfolio Sale Agreement whereby Ashland Funding asserts that it acquired the assets of DVI Funding. [C.P. 46, Ex. B].[3]

---

[3]     On April 15, 2007, the Alleged Debtor moved to strike the Second Amended Involuntary Petition due to the Original Petitioning Creditors failing to seek leave from this Court to amend the Involuntary Petition for a

4

10.    The trial on the Motion to Dismiss was held on April 20, 2009 at 11:00 a.m., at which time the parties agreed to the authenticity and admissibility of all of the documents to be submitted into evidence.  The parties also agreed to forego live testimony in lieu of using depositions transcripts already designated.  In addition, the parties further agreed to preserve objections on any grounds in connection with sworn statements provided by way of affidavits submitted in support or opposition to the Motion to Dismiss.

11.    After the trial on the Motion to Dismiss, the remaining Original Petitioning Creditors and Ashland Funding moved the Court to amend the Involuntary Petition for a third time (the "Third Amended Involuntary Petition"). [C.P. 77]   According to the Original Petitioning Creditors and Ashland Funding, the third amendment was required to correct and rectify an error in the calculation of the amounts allegedly due and owing by Rosenberg to the Original Petitioning Creditors and Ashland Funding. [Id., ¶ 6].

**B.**    **Factual Background**

    **(i)**    **The Master Leases, the Securitization Transactions and the DVI Financial Bankruptcy.**

12.    Starting in November, 2000, certain limited partnerships ("NMI LPs) entered into various equipment leases (the "Master Leases") with DVI Financial Services, Inc. ("DVI Financial") for the purpose of financing the acquisition of medical imagining and PET scan machines used at diagnostic imaging centers operated by the NMI LPs. [Ex. 75] [Ex. 104, ¶ 5]. As security for the payment of the obligations of the NMI LPs under the Master Leases, Rosenberg was required to execute and deliver an individual limited guaranty to DVI Financial. [Id.]   Two other entities related to the NMI LPs, namely National Medical Imaging, LLC

---

second time, and failure to seek authority to substitute DVI Funding as a party petitioner as required by Rules 7015 and 7025 of the Federal Rules of Bankruptcy Procedure as made applicable to this proceedings by virtue of Rule

("NMI") and National Medical Imaging Holding, LLC ("NMI Holding"), were also required to execute and deliver guaranty agreements to DVI Financial in varying amounts for the Master Leases. [Id.] The Master Leases were part of complex securitization transactions among DVI, Inc., U.S. Bank, N.A., as Trustee, and DVI Financial, as the original servicer. [Exs. 69-75].

13.    At various times from 2000 to 2003 and pursuant to the terms of certain Contribution and Servicing Agreements, DVI Financial transferred and assigned the Master Leases and related assets to certain corporations known as DVI Receivables Corp. XIV, DVI Receivables Corp. XVI, DVI Receivables Corp. XVII, DVI Receivables Corp. XVIII, DVI Receivables Corp. XIX, and DVI Funding Corporation (collectively, the "Transferees").   In connection therewith, DVI Financial agreed to service the Master Leases for such parties. [Id.]

14.    Simultaneously therewith and as part of the securitization transactions, each of the Transferees further transferred the Master Leases and related assets to the respective Original Petitioning Creditor with similar names (for example, DVI Receivables Corp. XVI simultaneously transferred the Master Leases and related assets it received from DVI Financial to DVI Receivables XVI, LLC, which is one of the Original Petitioning Creditors).   Such transfers were consummated pursuant to the terms of certain Subsequent Contract Transfer Agreements.   [Exs. 69 – 74]

15.    Each of the Subsequent Contract Transfer Agreements contains a legend on the cover page in all capital letters that states as follows:

> ALL RIGHTS IN AND TO THIS AGREEMENT ON THE PART OF THE DVI RECEIVABLES [*roman numeral*], LLC **HAVE BEEN ASSIGNED** AND ARE SUBJECT TO A SECURITY INTEREST IN FAVOR OF U.S. BANK NATIONAL ASSOCIATION (AS SUCCESSOR TO U.S. BANK TRUST NATIONAL ASSOCIATION), AS TRUSTEE, UNDER THE

1018 of the Federal Rules of Bankruptcy Procedure.   [C.P. #52] (the "Motion to Strike").   Based on the Court's dismissal of this Involuntary Case pursuant to this Order, the Court denies the Motion to Strike as moot.

INDENTURE DATED AS OF [*date*] FOR THE BENEFIT OF THE PERSONS REFERRED TO THEREIN.

(Emphasis added).

16.    Still further, with the exception of DVI Funding,[4] each of the Original Petitioning Creditors, simultaneously with the execution and delivery of the Subsequent Contract Transfer Agreements referred to above, completed the securitization transactions by entering into certain Indentures with the Trustee, pursuant to which the Original Petitioning Creditors (other than DVI Funding) issued notes to certain noteholders, represented by the Trustee. [Exs. 69-74].

17.    Notably, each Indenture in such securitization transactions includes the same "Granting Clause," which states as follows:

> "**The Issuer** [in each case the respective Original Petitioning Creditor] hereby **Grants**[5] **to the Trustee**, for the benefit and security of the Noteholders ... **all of the Issuer's right, title and interest in and to the Trust Property**.[6] ... The Grants of the Trust Property effected by this Indenture shall include all rights, powers, and options ... of the Issuer with respect thereto, **including without limitation, the immediate and continuing right to claim for, collect, receive, and give receipts for Contract Payments in respect of the Contracts and all other moneys payable thereunder ... to bring judicial proceedings in the name of the Issuer or otherwise ... enforce all rights and remedies of the Issuer** ... of the ... Servicer under the Contribution and Servicing Agreement, and generally to do and receive anything that the Issuer is or may be entitled to do or receive thereunder or with respect thereto."

See, e.g. [Ex. 72, PC 001071). (Emphasis added).

18.    Moreover, the securitization transactions included certain Sale Agreements, pursuant to the terms of which the "Issuer" under the Indenture (namely the respective Original

---

[4] DVI Funding entered into a separate Loan and Security Agreement with the Trustee and did not securitize its Master Leases. DVI Funding asserts that it subsequently transferred its Master Leases to Ashland Funding. As a result, the Court need not evaluate the financing arrangement between DVI Funding and the Trustee.

[5] As defined in the Indenture, Grant "means to grant, bargain, sell, convey, assign, transfer, mortgage, pledge, create and perfect a security interest in ...." See, e.g. [Ex. 72, PC 001226].

[6] Pursuant to the Indenture, "Trust Property" includes the "Company Assets." See e.g. [Ex. 72, PC 001237]. The "Company Assets" includes the "Contributed Property." See e.g. [Ex. 72, PC 001218]. The "Contributed

Petitioning Creditor) acknowledges that the rights of the Issuer in and to the Master Leases (and related assets) "will be assigned by the issuer to the [Trustee] for the benefit of the [Trustee] and the Issuer Noteholders ...." See, e.g., [Exs. 86, §§ 5 and 6] [Ex. 87, §§ 5 and 6].

19.    Pursuant to the terms of the Indentures, all monies paid in respect of the Master Leases are paid to the Trustee for further payment to the noteholders under the various Indentures. [Exs. 69-74] [Ex. 104, ¶17].  As a result, the Original Petitioning Creditors do not receive any of the cash flow generated from the Master Leases. [Ex. 104, ¶ 11].

20.    On August 25, 2003, DVI Financial, together with other affiliates filed voluntary Chapter 11 petitions under the Bankruptcy Code in the District of Delaware (the "DVI Bankruptcy Court"). [Ex. 23].  Pursuant to Order, dated February 3, 2004, the DVI Bankruptcy Court approved, among other relief, the assumption and assignment of the Contribution and Servicing Agreements (as amended) relating to the Master Leases from DVI Financial to Lyon. [Id.]  After the entry of the February 3, 2004 Order by the DVI Bankruptcy Court, Lyon took over the servicing obligations in respect of the Master Leases. [Id., p. 26].

21.    In connection with its servicing of the Master Leases, Lyon provides periodic servicing reports to the Trustee on the amounts collected in connection with the Master Leases. [10/01/08 J. Fox Dep., p. 46].

22.    Lyon is indirectly affiliated with the Trustee through its parent company, U.S. Bank Corp. Equipment Finance, which is wholly owned by U.S. Bank N.A. [04/02/08 J. Fox Dep., pp. 28-29].

**(ii)    Events Leading to Settlement Agreement and Rosenberg's Single Limited Guaranty.**

---

Property" includes the Master Leases sold to the Original Petitioning Creditor by DVI Financial. See e.g. [Ex. 72, PC 001220].

23.     Starting on December 19, 2003, Lyon filed thirteen separate lawsuits against each of the NMI LPs and Rosenberg, as a guarantor, in the Court of Common Please of Bucks County, Pennsylvania (the "Original Bucks County Actions") for recovery of amounts allegedly due under the Master Leases. [Ex. 75, Sch. 6; Ex. 24]. The plaintiff named in the complaint commencing the Original Bucks County Actions was Lyon and not the individual Original Petitioning Creditors. [Id.] In fact, Lyon describes itself in the Original Bucks County Action as "servicer for [the Trustee]" and not as servicer for the Original Petitioning Creditors. Id.

24.     While the Original Bucks County Actions were pending, on March 3, 2005, three of the current named Petitioning Creditors, namely DVI XIX, DVI XVIII, and DVI XVII, filed an involuntary petition under Chapter 11 of the Bankruptcy Code against both NMI and NMI Holding in the United States Bankruptcy Court for the Eastern District of Pennsylvania, Case Nos. 05-12714-DWS and 05-12719-DWS (the "NMI Original Petitions"). [Exs. 12 and 13]. Two other entities, General Electric Capital Corporation and Universal Shielding Corporation, also joined as petitioning creditors in the two involuntary cases. [Id.]

25.     The NMI Original Petitions were contested. See [Exs. 2 and 5]. On August 12, 2005, however, Rosenberg, NMI, NMI Holding and the NMI LPs entered into the Settlement Agreement with Lyon for the purpose of restructuring the obligations under the Master Leases. [Exs. 26 and 75].

26.     The parties to the Settlement Agreement are listed in the first paragraph thereof and on the signature page. The first paragraph of the Settlement Agreement indicates that the parties are NMI, NMI Holding, the NMI LPs, Rosenberg, and Lyon, in its capacity as the successor servicer for the Original Petitioning Creditors and as agent to the Trustee.

27.     The Settlement Agreement was signed by Lyon and not by the Original Petitioning Creditors. In fact, Lyon signed the Settlement Agreement as servicer for the Original

9

Petitioning Creditors and as agent for the Trustee. Ms. Fox signed the Settlement Agreement on behalf of Lyon as its "Director of Operations."

28.     The Settlement Agreement provides and requires that Rosenberg, NMI and NMI Holding each execute and deliver a guaranty agreement. [Id]. In this regard, Rosenberg executed an individual limited guaranty (the "Limited Guaranty") in the maximum amount of $7,661,945.00, which was to be reduced each month by the sum of $127,699.08 for each monthly payment made on account of the Master Leases as set forth in the Settlement Agreement. [Ex. 27].

29.     The Limited Guaranty specifically provides that, subject to the above dollar amount limitation, Rosenberg "unconditionally, absolutely, and irrevocably guarantee[d] the full and prompt payment when due, whether by acceleration or otherwise, the sums identified... **to the Agent**... due thereunder and arising after the date of this Limited Guaranty...." [Id., ¶ 2] (Emphasis added). Further, the Limited Guaranty defines Agent as "Lyon Financial Services, Inc. d/b/a U.S. Bank Portfolio Services as successor servicer for the Lessors and as agent for the Trustee." [Id., ¶ 1].

30.     Moreover, the Limited Guaranty specifically provides that it supersedes and replaces all prior guaranties, which were to be marked by Lyon as "Cancelled" and returned promptly to Rosenberg. [Id.]

31.     As of August 12, 2005 and again as of the Petition Date, the Limited Guaranty is the only document in existence that purports to create obligations of Rosenberg in connection with the matters contained therein.

32.     The Limited Guaranty requires that Rosenberg execute one confession of judgment in favor of Lyon (the "Confession of Judgment"), [Ex. 27, ¶ 17], which document Rosenberg executed. [Ex. 28].

33. The Limited Guaranty contains several other provisions, which obligations thereunder run solely to and in favor of Lyon. Specifically, upon an event of default under the Limited Guaranty, only Lyon can demand payment of the obligations thereunder and only the fees and expenses of Lyon are required to be paid by Rosenberg. [Ex. 27, ¶2]

34. The Limited Guaranty specifically provides that it shall be continuing and not discharged, impaired or affected by "the **ability of the Agent or the Trustee to enforce** this Limited Guaranty or any provision of the Modified Leases." [Ex. 27, ¶3(d)] (Emphasis added).

35. The Limited Guaranty provides that "amounts received by **the Agent**" may be "applied by **the Agent**" to the obligations "as **the Agent** may from time to time elect." [Ex. 27, ¶4] (Emphasis added). The Original Petitioning Creditors are not given any such rights.

36. There are a myriad of actions permitted to be taken by Lyon, none of which provide any rights to the Original Petitioning Creditors. [Ex. 27, ¶5] Only Lyon, and not the Original Petitioning Creditors, has the right to assign the obligations under the Limited Guaranty to others. [Ex. 27, ¶9]

37. Section 16 of the Limited Guaranty provides for an allocation of the limited obligation thereunder among the "Modified Leases." It does not specifically provide for an allocation to any of the Original Petitioning Creditors. Section 16 of the Limited Guaranty provides for an accounting of the payments to be received but it does not create any separate obligation to any of the Original Petitioning Creditors.

38. On March 21, 2008, Lyon notified NMI and Rosenberg that a purported event of default had occurred by reason of the NMI LPs' failure to make monthly payments as required under the terms of the Settlement Agreement. [Ex. 45]. In such letter, counsel to Lyon asserted that "[Lyon] is entitled to all of the rights and remedies" provided in the Settlement Agreement, "including, without limitation, the right to accelerate the unpaid balance due under the Leases

and enforce the Guaranties and Confessions of Judgment as provided therein." [Id.]  Counsel to Lyon further stated in the March 21, 2008 letter that Lyon would review a proposal to restructure the payments under the Settlement Agreement. [Id.] However, counsel for Lyon nevertheless made it clear that "[n]o consideration of any proposal shall constitute a forbearance by [Lyon] from enforcing its rights and remedies under the Settlement Agreement." [Id.]   Nowhere in the letter did counsel to Lyon reference the Original Petitioning Creditors.

39.    The letter did not expressly demand payment from Rosenberg as a result of the alleged event of default and did not indicate the amounts due under the Limited Guaranty would be accelerated.  Notwithstanding, no opportunity to cure was provided to Rosenberg in such letter.  There are no other demand and/or acceleration letters or notices from Lyon (or any other party for that matter) to Rosenberg under the Limited Guaranty. [10/01/08 J. Fox Dep., p. 109]

40.    On July 31, 2008, Lyon proceeded to file a complaint in confession of judgment against Rosenberg and others in the Court of Common Pleas of Bucks County, Pennsylvania (the "Second Bucks County Action"). [Ex. 49].  The plaintiff in the Second Bucks County Action was Lyon as agent for the Trustee.  Lyon did not file such action as successor servicer to the Original Petitioning Creditors.  In addition, the Original Petitioning Creditors were not plaintiffs in the Second Bucks County Action.

41.    In the Second Bucks County Action, a judgment was entered in favor of Lyon and against Rosenberg, as guarantor, in the sum of $4,724,866.16 [Ex. 48], which Lyon claimed as the amount allegedly due by Rosenberg under the Limited Guaranty in connection with the "Master Leases" as such obligation was modified by the Settlement Agreement. [Id.]

42.    Rosenberg disputed the alleged debt owed to Lyon and, on August 22, 2008, Rosenberg and the other defendants in the Second Bucks County Action jointly filed a Petition to Strike or Open Confessed Judgments and Request for Stay of Execution (the "Bucks County

Petition") on the grounds that, among other reasons: (1) the confessed judgment against Rosenberg was improper and not authorized by the guaranty agreements; (2) Rosenberg did not owe the underlying debt which formed the basis of the judgment; (3) Lyon failed to comply with the mandates of the confession of judgment before taking the judgment against Rosenberg; (4) Rosenberg did not knowingly, intelligently and voluntarily waive any constitutional rights in connection with the warrant for confession of judgment; (5) the amounts of the confessed judgments were wrong and inaccurate; (6) no consideration was given to Rosenberg for the warrant of attorney to confess judgment; and (7) the confession of judgment was unconscionable and void by virtue of Lyon's failure to comply with Settlement Agreement and by its own wrongful conduct. [Ex. 51].

43.     By order dated August 28, 2008 in the Second Bucks County Action, the execution on the confessed judgment against Rosenberg was stayed pending disposition of the Bucks County Petition. [Ex. 50].

44.     On September 11, 2008, Lyon filed a response in opposition to the Bucks County Petition denying the allegations set forth therein. [Ex. 52]. Lyon, however, admitted in such response that the amount of the confessed judgment obtained against Rosenberg and the other guarantors was overstated by $58,351.40. [Id., ¶¶ 59, 63, and 65-66].

**(iii)    The Involuntary Petitions Filed against Rosenberg.**

45.     Within a mere couple of months after the Pennsylvania state court entered an order staying the Bucks County Petition, the Original Petitioning Creditors filed the Original Involuntary Petition. [Ex. 6].

46.     A review of the signature blocks on the Original Involuntary Petition evidences that Ms. Jane Fox ("Ms. Fox") signed the Original Involuntary Petition individually on behalf of each Original Petitioning Creditor. [Ex. 6].   Nowhere on the Original Involuntary Petition did

Ms. Fox indicate her title in respect of the Original Petitioning Creditors as required by the Original Involuntary Petition.

47.     Ms. Fox is not an officer, director or employee of any of the Original Petitioning Creditors, and in fact has no position with any of the Original Petitioning Creditors. Rather, Ms. Fox is the Director of Operations for Lyon Financial Services, Inc. d/b/a U.S. Bank Portfolio Services ("Lyon"). [Ex. 104, ¶ 1].  It does not appear that Ms. Fox signed the Original Involuntary Petition on behalf of or for Lyon, either in her capacity as Director of Operations or otherwise.

48.     It is important to note that as of the Petition Date, the corporate good standing of each Original Petitioning Creditor (except for DVI XIX) had lapsed and such Original Petitioning Creditors had been administratively dissolved. [Ex. 47].  It was not until mid-January, 2009 that Lyon, through its in-house counsel, John Docken, sought to re-instate such Original Petitioning Creditors at Ms. Fox's direction. See [Ex. 68] [04/02/09 J. Fox Dep., pp. 117-123].  It is also important to note there was no meeting of the directors or officers of the Original Petitioning Creditors to authorize Ms. Fox to sign the Original Involuntary Petition. [Id., pp. 33-34].  In fact, no one at Lyon, including Ms. Fox, has ever spoken to, emailed, or corresponded with any one at the Original Petitioning Creditors prior to the filing of the Original Involuntary Petition. [Id., p. 46].

49.     According to Ms. Fox, only Lyon had authority to sign the Original Involuntary Petition. [04/02/09 J. Fox Dep., pp. 31-33], and none of the Original Petitioning Creditors had the authority to do so on their own behalf. [Id.]    Notwithstanding, neither the Original Involuntary Petition nor the Second Amended Involuntary Petition is signed by Lyon as servicer for the Original Petitioning Creditors or as agent for the Trustee.  Lyon is not one of the Original Petitioning Creditors, either in its capacity as the successor servicer for the Original Petitioning

Creditors or as agent for the Trustee. In addition, the Trustee is not one of the Original Petitioning Creditors. Rather, the only reference to Lyon on the Original Involuntary Petition is simply the mailing address used by Ms. Fox.

50.     Lyon asserts that the Contribution and Servicing Agreements, as amended through the DVI Financial bankruptcy case, grant it the sole authority to file the Original Involuntary Petition as servicer in the name of the Original Petitioning Creditors. [04/07/09 J. Fox Dep., pp. 31-33, 96-98]. See also [Exs. 22, 23 and 69-74]. The Court has reviewed the Contribution and Servicing Agreements and there is no reference to Lyon's authority to file an involuntary bankruptcy, or take any other action for that matter, in the name of the Original Petitioning Creditors as opposed to in the name of Lyon. To the contrary, the Court notes that the Indentures contain a specific provision allowing only the Trustee to commence judicial actions in the name of the Original Petitioning Creditors. The Trustee, however, did not sign the Original Involuntary Petition or the Second Amended Involuntary Petition.

51.     In addition, on July 31, 2008, Lyon filed the Second Bucks County Action against Rosenberg related to the Settlement Agreement and did so in its capacity "as agent" for the Trustee. [Ex. 49]   Notably, Lyon did not commence the Second Bucks County Action as the successor servicer for the Original Petitioning Creditors even though Lyon was asserting the same obligations therein as are being asserted by the Original Petitioning Creditors in the Original Involuntary Petition. Id. The Original Petitioning Creditors were not listed as plaintiffs in the Second Bucks County Action. Id.

52.     In the Original Involuntary Petition, each of the Original Petitioning Creditors based their respective claims on the Limited Guaranty and asserted a claim against Rosenberg in the following amounts, which total $5,363,361.56:

| Petitioning Creditor | Amount |
|---|---|
| DVI XIV | $1,001,833.96 |
| DVI XVI | 1,001,833.96 |
| DVI XVII | 1,001,833.96 |
| DVI XVIII | 1,001,833.96 |
| DVI XIX | 1,001,833.96 |
| DVI Funding | 354,191.76 |
| Total | $5,363,361.56 |

[Ex. 6].

53.    The amounts included in the Original Involuntary Petition were calculated by Mr. Brier. [04/06/09 R. Brier Dep., pp.147-148].   Other than knowing that the Original Petitioning Creditors were part of the Settlement Agreement, Mr. Brier did not do anything to determine whether any of the Original Petitioning Creditors were indeed creditors of Rosenberg. [Id., pp. 154, 160].   Likewise, in determining the amounts to include in the Original Involuntary Petition, Mr. Brier admitted that "the Settlement Agreement did not identify a particular amount relative to Mr. Rosenberg's guarantee to each of the DVI Entities [the Original Petitioning Creditors"]." [Id., p. 160].   In addition, Mr. Brier admitted that there was no schedule in the "Settlement Agreement that identified the exact amount of each guarantee as it relates to the [Original Petitioning Creditors]." [Id., p. 161].   As a result, Mr. Brier made certain assumptions about the amount of each claim for the Original Petitioning Creditors, namely he selected a number for DVI Funding and then allocated the balance of the total obligation evenly over the remaining Original Petitioning Creditors. [Id., pp. 160-161, 168].

54.     Because the Original Involuntary Petition (as amended by the First Amended Involuntary Petition) did not account for the correct amounts individually claimed by each Original Petitioning Creditor, [04/02/09 J. Fox Dep., p. 39], on April 7, 2009, the Second Amended Involuntary Petition was filed. [Ex. 82]. In the Second Amended Involuntary Petition, the nature of the claim asserted by the Original Petitioning Creditors remained the same, namely, the Limited Guaranty. [Id.]  However, the amounts claimed to be owed were different than the amounts claimed to be owed on the Original Involuntary Petition. [Id.]

55.     The Second Amended Involuntary Petition did not include and was not signed by DVI Funding, who signed and joined in the Original Involuntary Petition. [Id.]  Rather, it included a new party petitioner named Ashland Funding, who was not an Original Petitioning Creditor. [Id.]  Like the other Original Petitioning Creditors, Ashland Funding bases its claim against Rosenberg on the Limited Guaranty. [Id.]  Ms. Fox signed the Second Amended Involuntary Petition for Ashland Funding with an address "Ashland Funding, LLC, as successor to DVI Funding, LLC, 196 W. Ashland St., Doylestown, PA." [Id.] The signature block for Ashland Funding, however, does not refer to Lyon at all, including Lyon's mailing address. [Id.]

56.     The total amount of the claims asserted in the Second Amended Involuntary Petition remained at $5,363,361.56, which was the same total amount claimed by all of the Original Petitioning Creditors in the Original Involuntary Petition (as amended by the First Amended Involuntary Petition). [Id.]

57.     However, the amounts listed for each Original Petitioning Creditor in the Second Amended Involuntary Petition were different than those listed in the Original Involuntary Petition.  The amounts claimed in the Second Amended Involuntary Petition were as follows:

| Petitioning Creditor | Amount |
|---|---|
| DVI XIV | $437,598.87 |
| DVI XVI | 892,617.66 |
| DVI XVII | 1,344,700.18 |
| DVI XVIII | 1,012,033.70 |
| DVI XIX | 1,390,587.85 |
| Ashland Funding | 285,823.30 |
| Total | $5,363,361.56 |

[Id.]

58.     As with the Original Involuntary Petition, Mr. Brier calculated the revised amounts claimed by each of the remaining Original Petitioning Creditors and Ashland Funding. [04/06/09 J. Fox Dep., pp. 52-53] [Exs. 6-B, 79].

59.     The Second Amended Involuntary Petition attached a copy of a certain Portfolio Sale Agreement, dated March 2, 2007, by and between Ashland Funding and West AB LG, whereby West AB LG agreed to direct DVI Funding to sell to Ashland Funding all of DVI Funding's right, title and interest in the agreements listed on Exhibit A to the Portfolio Sale Agreement. See [Ex. A to Ex. 82].  However, Exhibit A to the Portfolio Sale Agreement only contains one un-redacted item that references an agreement with National Medical Imaging of PA. [Id.].  There is no reference in the Portfolio Sale Agreement or the Exhibit A attached thereto to Rosenberg or the Limited Guaranty.

60.     In addition, there is a Servicing Agreement, dated March 19, 2007, by and between Ashland Funding and Lyon, pursuant to the terms of which Lyon agreed to service certain contracts purchased by Ashland Funding from West AB LG and listed on Schedule A

thereto. [Ex. 83]. The Servicing Agreement, however, does not contain a Schedule A, and there is no other evidence that it is the assignee of any obligations owed by Rosenberg to any person, including specifically in respect of the Limited Guaranty. [Id.]

61.     The provisions of the Limited Guaranty specifically provide that only Lyon can assign and transfer any of the Modified Leases (defined therein) or the obligations owed under the Limited Guaranty.  [Ex. 27, ¶9]     There is no evidence in the record of an assignment by Lyon to Ashland Funding of the obligations of Rosenberg to Lyon under the Limited Guaranty.

62.     The Court finds it of interest to note that Mr. Brier is a member of Ashland Funding. [04/06/09 R. Brier, pp. 42-43]. In addition, Robert Walton is an attorney with the law firm who represents the Original Petitioning Creditors, Ashland Funding and Mr. Brier, and he is the other member of Ashland Funding. [Id., p. 43].  See also [Exs. 6, 7, and 82] [04/06/09 R. Brier, pp. 6-7].

## II.     DISCUSSION

### A.     None of the Original Petitioning Creditors or Ashland Funding is a Creditor of Rosenberg

To determine the propriety of a contested involuntary filing against a person who may be a debtor, a bankruptcy court must undertake a two-part analysis.  In re Elrs Loss Mitigation, LLC, 325 B.R. 604, 624 (Bankr. N.D. Okla. 2005).  Initially, the court must determine whether the creditors who filed the petition are eligible to do so.  If the petitioning creditors lack standing, the bankruptcy court lacks jurisdiction over the case, and thus the involuntary case must be dismissed.

In a bankruptcy case, "the interpretation of private contracts is ordinarily a question of state law." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 60 n. 4 (1995) (quoting *Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 474

(1989)).  Under the *lex loci contractus* doctrine, a contract is governed by the law of the state in which the contract is made or is to be performed. *Goodman v. Olsen*, 305 So.2d 753, 755 (Fla. 1974). If a matter arises concerning validity, execution, or interpretation of a contract, the law of the state where the contract was made governs. *New England Machinery v. Conagra Pet Products Co.*, 827 F. Supp. 732, 735 (M.D. Fla. 1993).

In this case, the Limited Guaranty has a governing law provision, making the laws of Pennsylvania applicable for the interpretation of the agreement. See [Ex. 27, ¶ 13].  Under Pennsylvania law, "[i]t is firmly settled that the intent of the parties to a written contract is contained in the writing itself." *Krizovensky v. Krizovensky*, 624 A.2d 638, 642 (Pa. Super. 1993), *aff'd*, 637 A.2d 287 (Pa. 1993). Accordingly, when the words of a contract are clear and unambiguous, the Court can determine what the parties intended only by looking only at the express language of the agreement. *Id.*

Each Original Petitioning Creditor, as well as Ashland Funding, asserts that the basis of their "individual" claims against Rosenberg stem from a "guaranty" given by Rosenberg allegedly in their favor.  However, there is no guaranty executed by Rosenberg in favor of any of the Original Petitioning Creditors or Ashland Funding.   Rather, as noted above, the only guaranty in existence from Rosenberg is the Limited Guaranty, and the language of the Limited Guaranty is clear and unambiguous.  The obligations asserted to be owed under the Limited Guaranty are owed to, and run solely in favor of, Lyon in its capacity as successor servicer and as agent for the Trustee.  The Court further concludes that Ashland Funding is not a creditor of Rosenberg because (i) DVI Funding did not have a separate obligation owed to it by Rosenberg under the Limited Guaranty, (ii) Rosenberg has no direct obligation to Ashland Funding, and (iii) Ashland Funding did nor acquire any obligation owed by Rosenberg to any person or entity,

including in particular Lyon.  Accordingly, none of the Original Petitioning Creditors or Ashland

Funding is a creditor of Rosenberg.

**B.**      **The Original Petitioning Creditors Are Not The Real Parties in Interest.**

Rule 17 of the Federal Rules of Bankruptcy Procedure provides that "[a]n action must be

prosecuted in the name of the real party in interest."   The purpose of this rule is to require that

an action be brought "in the name of the party who possesses the substantive right being asserted

under the applicable law...." 6A Wright, Miller & Kane, federal Practice and Procedure: Civil 2d

§ 1541 (1990) ("Wright"). *See also* Comments to 1966 Amendment to Fed. R. Civ. P. 17 (the

purpose of the real party in interest rule is "to protect the defendant against a subsequent action

by the party actually entitled to recover, and to insure generally that the judgment will have its

proper effect as *res judicata*").

In loan securitizations, the real party in interest is the trustee of the securitization trust,

not the servicing agent. *See In re Kang Jin Hwang*, 396 B.R. 757 (Bankr. C.D. Cal. 2008) (citing

approvingly to *LaSalle Bank N.A. v. Nomura Asset Capital Corp.*, 180 F.Supp.2d 465, 469-71

(S.D.N.Y. 2001) and *LaSalle Bank N.A. v. Lehman Bros. Holdings, Inc.*, 237 F.Supp.2d 618,

631-34 (D. Md. 2002)). *Greer v. O'Dell*, 305 F.3d 1297 (11th Cir. 2002) (mortgage servicer is a

party in interest in proceedings involving loans which it services).  In this case, the Original

Petitioning Creditors, as well as Ashland Funding, are not the "real party in interest" entitled to

pursue any claims against Rosenberg as they are "special purpose entities" ("SPEs") created

solely for purposes of the securitization transactions described above.  The SPEs were just pass

through vehicles. [Id.]  As Ms. Fox admitted, the Original Petitioning Creditors will not receive

any residual value from these assets as the debt they owe to their noteholders far exceeds the

value of their assets.  As a result, the Original Petitioning Creditors do not have any economic

interest in such assets or any guaranty related thereto, including the Limited Guaranty.

Similarly, Ashland Funding has no economic interest in this matter as Rosenberg owes no obligation to Ashland Funding under any documents of record.

The Indenture grants the Trustee the right to collect on the contracts and more importantly to bring lawsuits to do so. See [Exs. 69-72 (Indentures)]. That is not what happened here. The Trustee did not sign the Original Involuntary Petition or the Second Amended Involuntary Petition. Moreover, Lyon, as the agent for the Trustee, did not sign the Original Involuntary Petition or the Second Amended Involuntary Petition as an agent for the Trustee.

Lyon insists that the power to commence legal action and this involuntary bankruptcy case emanates from the Contribution and Servicing Agreements. However, the Contribution and Servicing Agreements, as amended, do not expressly provide Lyon a power of attorney or other authority to commence litigation, file an involuntary bankruptcy petition or otherwise act on behalf of the Original Petitioning Creditors.

In addition, the Original Petitioning Creditors are not parties in interest under Section 1109(b) of the Bankruptcy Code. While the Bankruptcy Code does not specifically define the term "party in interest", the term generally includes "'all persons whose pecuniary interest are [sic] directly affected by the bankruptcy proceedings.'" In re E.S. Bankest, L.C., 321 B.R. 590, 594 (Bankr. S.D. Fla. 2005). Because no such definition exists, a determination must be made on a case-by-case basis. Id. at 595.

In securitization cases, a servicer may be considered a party in interest to commence legal action as long as the trustee joins or ratifies its action. Kang Jin Hwang, 396 B.R. at 772. Several courts have determined that mortgage servicers can, in certain circumstances, be considered a party in interest regarding the enforcement of the loans serviced by it. See, e.g., Greer v. O'Dell, 305 F.3d 1297, 1302-03 (11th Cir. 2002).

In the instant case, the Original Petitioning Creditors and Ashland Funding were nothing more than pass-through entities to facilitate the securitization transactions. No actual injury can be traced to these entities, which could potentially be redressed by the bankruptcy estate. These entities have no pecuniary interest or stake in the future administration of a bankruptcy estate should this Court enter an order for relief in this case. If any economic stake exists in this case, it runs in favor of the Trustee or Lyon, as successor servicer and as agent for the Trustee. Taking all these factors into consideration, the Original Petitioning Creditors and Ashland Funding are not parties in interest and therefore lack standing as a matter of law to file an involuntarily petition against Rosenberg.

## C.    The Petitioning Creditors are Judicially Estopped from Prosecuting this Involuntary Case

Even if the Original Petitioning Creditors were considered the real party in interest in this case, they are nonetheless judicially estopped from prosecuting this involuntary bankruptcy case against Rosenberg. The doctrine of judicial estoppel prevents a party from presenting an inconsistent position after successfully maintaining that position in an earlier proceeding. *Fetterhoff v. Liberty Life Assur. Co.,* 282 Fed. Appx. 740 (11th Cir. 2008) (citing to *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)). Judicial estoppel is appropriate where (1) the party's later position is "clearly inconsistent" with its earlier position, (2) the party succeeded in persuading the court to accept its earlier proposition, and (3) the party would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *Id.*, 532 U.S. at 749-51.

In the instant case, Lyon, as the agent for the Trustee, filed a complaint to confess judgment against Rosenberg in the Second Bucks County Action, claiming that Lyon "is entitled to, among other things, $4,724,866.16." Indeed, Lyon obtained a judgment by confession

against Rosenberg in the Second Bucks County Action. See [Ex. 48].   Now, in this bankruptcy proceeding, Lyon's representative is asserting that the Original Petitioning Creditors are the entities to whom the Limited Guaranty runs and to whom the obligations are owed.  When asked why Lyon filed the Second Bucks County Action in the name of Lyon as agent for the Trustee, yet the Original Petitioning Creditors filed the Original Involuntary Petition, Ms. Fox testified that she did not have an explanation.  [04/02/09, J. Fox Dep., p. 76, Lines 8-13].

The Court believes that the explanation for taking this inconsistent position was to artificially create six creditors for the improper purpose of attempting to satisfy the provisions of Section 303(b) of the Bankruptcy Code.   Consequently, Lyon, through the artifice of utilizing the Original Petitioning Creditors in filing this involuntary case, is judicially estopped from taking a position in this Court that is inconsistent with and different from the earlier position it took in the Second Bucks County Action.   Therefore, Lyon, and the Original Petitioning Creditors on whose behalf the Lyon representative signed the petition, is judicially estopped from adopting a different position in this case.

**D.      At Most, One Creditor Exists**

Section 303(b) of the Bankruptcy Code sets forth both quantitative and qualitative requirements for filing an involuntary petition, namely: (1) the petition must be brought by not less than three eligible creditors, unless there are not more than eleven eligible creditors (after reduction for the specified excluded creditors), and (2) the claims of the petitioning creditors must not be subject to "*bona fide* dispute".  *In re Compuhouse Systems, Inc.*, 168 B.R. 305 (Bankr. W.D. Pa. 1994).

The Original Petitioning Creditors and Ashland argue that they are each separate legal entities whose corporate formation should not be disregarded.  However, the Court cannot ignore the fact that each of them do not hold a separate and distinctive claim against Rosenberg under

24

the Limited Guaranty, which is the only document giving rise to any purported liability Rosenberg may have.  Section 303(b)(1) requires not only that there be three creditors, but also that each of such creditors hold a separate claim against the alleged debtor; however, the Limited Guaranty herein runs exclusively to Lyon.

The Settlement Agreement may be deemed a novation -- a mutual agreement between the parties for the discharge of a valid existing obligation by the substitution of a new valid obligation.  There are four essential elements necessary to form a substitute contract or novation: (1) the existence of a previously valid contract; (2) the agreement of the parties to cancel and extinguish the first contract; (3) the agreement of the parties that the second contract takes the place of the first; and (4) the validity of the new contract.  *De Las Cuevas v. National Enterprises Inc.*, 927 So.2d 41 (Fla. 3d DCA 2006).   A novation may occur where there is a mutual agreement between the parties to discharge a valid existing obligation by the substitution of a new valid obligation.  *See Jakobi v. Kings Creek Vill. Townhouse Ass'n*, 665 So.2d 325, 327 (Fla. 3d DCA 1995) (citing *Ades v. Bank of Montreal*, 542 So.2d 1013 (Fla. 3d DCA 1989)).  Whether a novation takes place depends upon the intent of the parties.  *Id.* The intent can be determined by the documents if the terms are not in dispute.  *First Lehigh Bank v. Haviland Grille, Inc.*, 704 A.2d 135 (Pa. Super. 1997).

A novation is accepted by the parties as "satisfaction of a pre-existing duty, [which] thus bars the revival of the pre-existing duty following a breach of the substituted contract." *Nernberg & Laffey v. Patterson*, 601 A.2d 1237, 1239 (1991)(quoting *Hydro-Flex, Inc. v. Alter Bolt Co.*, 296 A.2d 874, 878 (1972)).  However, whether a contract has the effect of a novation primarily depends upon the parties' intent.  *Id.*  The party asserting its existence bears the burden of demonstrating the parties had a "meeting of the minds." Id. at 1240.

25

As noted above, on or about August 12, 2005, Rosenberg, NMI, NMI Holding, the NMI LPs and Lyon entered into the Settlement Agreement for the purpose of restructuring the obligations under the Master Leases.    Pursuant to the terms of the Settlement Agreement, the Master Leases were modified and consolidated into a single obligation constituting a claim by Lyon, as successor servicer and agent for the Trustee.  The Limited Guaranty stated, in pertinent part, that Rosenberg "unconditionally, absolutely and irrevocably guarantees the full and prompt payment when due. . . the sums identified as the "Guaranteed Amount" for each Modified Lease… *to the Agent*," identified in the Settlement Agreement as Lyon.  The Limited Guaranty replaced and superseded all prior guaranty agreements executed by Rosenberg in favor of DVI Financial, and Rosenberg was released from such obligations.   Accordingly, the Settlement Agreement and related documents, including the Limited Guaranty, establish the requisite meeting of the minds of the parties to regard such contracts as a novation of the old obligations.

## E.    The Petitioning Creditors and Ashland Funding Hold Contingent Claims Subject to a *Bona Fide* Dispute

### 1.  The Alleged Claim is Contingent.

To have standing under Section 303(b), the petitioning creditor must hold a claim that is neither contingent nor subject to a *bona fide* dispute as to liability or amount. 11 U.S.C. §303(b); *In re Raymark Industries, Inc.*, 99 B.R. 298 (Bankr. E.D. Pa. 1989).  A claim is contingent as to liability if an alleged debtor's legal duty to pay does not come into existence until triggered by the occurrence of an extrinsic event and such extrinsic event or occurrence was one that was reasonably contemplated by the parties at the time the event giving rise to the claim occurred. *In re All Media Properties, Inc.*, 5 B.R. 126, 133 (Bankr. S.D. Tex. 1980) *aff'd.*, 646 F.2d 193 (5th Cir. 1981). *See also, In re Pambianco*, 206 B.R. 351 (Bankr. M.D. Pa. 1996).

The claim against Rosenberg is, without dispute, contingent. The contingent nature of the purported claim is demonstrated in the Second Bucks County Petition. As set forth therein, a demand for payment must be made upon Rosenberg before any liability matures under the Limited Guaranty. Likewise, the confession of judgment as to Rosenberg contains a restriction or condition that judgment may be confessed only upon a default under the Limited Guaranty and only after providing Rosenberg with written demand for payment and the opportunity to cure such default. Thus, a default under the Limited Guaranty and demand for payment are the required extrinsic events which must occur before Rosenberg's liability, if any, is triggered. *See In re Albano,* 55 B.R. 363, 366 (N.D. Ill. 1985) (guarantor's liability is contingent until default). Because no demand for payment was formally made upon Rosenberg and no opportunity to cure was provided to him, there is no default under the Limited Guaranty. Absent such default, any claim against Rosenberg grounded on the Limited Guaranty is, at best, inchoate.

2.     The "Claim" Is Subject To a *Bona Fide* Dispute

Even assuming *arguendo* that the Court was to conclude that the claim under the Limited Guaranty was not contingent, such claim is nevertheless subject to a *bona fide* dispute. The Bucks Country Petition is disputed on several grounds, including the validity of the confessed judgment against Rosenberg and the amount asserted against Rosenberg therein.

The standard to be applied to determine whether a debt is the subject of a *bona fide* dispute is whether "there is a genuine issue of a material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to disputed facts." *B.D.W. Assocs., Inc. v. Busy Beaver Bldg. Centers, Inc.*, 865 F.2d 65, 66-67 (3d Cir. 1989); *see also, In re DBA Const. Co., Inc.*, 1988 WL 80869 at *2 (Bankr. E.D. Pa. Aug. 1, 1998). *See also In re AXL Indus., Inc.*, 127 B.R. 482, 484 (S.D. Fla. 1991). *Accord In re General Trading, Inc.*, 87 B.R. 216, 219-20 (Bankr. S.D. Fla. 1988) (adopting standard set forth in *In re Busick*, 65 B.R.

27

630, 637-38 (N.D. Ind. 1986)).  In *Matter of Busick,* 831 F.2d 745 (7th Cir. 1987), the Court

explained this standard further:

> "Under this standard, the bankruptcy court must determine whether
> there is an objective basis for either a factual or a legal dispute as
> to the validity of debt. However, '[t]he statute does not require the
> court to determine the outcome of any dispute, only its presence or
> absence. Only a limited analysis of the claims at issue is
> necessary.' Busick, 65 B.R. [630] at 637 [(N.D. Ind. 1986)]. . ."

*Busick, supra.* at 750. *See also, In re Prisuta,* 121 B.R. 474 (Bankr. W.D. Pa. 1990).

The *Busick* test has been adopted by Courts in this District to determine whether a claim

is the subject of a *bona fide* dispute -- dismissal is appropriate if there is a genuine issue of

material fact which bears upon the debtor's liability, or a meritorious contention as to the

application of the law to the undisputed facts. *See AXL Indus., Inc.*, 127 B.R. at 485; General

Trading, Inc., 87 B.R. at 219-20.  "The test does not require a decision on the resolution of any

dispute, only a determination that a dispute exists." *In re Downie*, 110 B.R. 62, 63 (Bankr. N.D.

Fla. 1989).  The Court "must determine whether there is an objective basis for either a factual or

a legal dispute as to the validity of debt." *Busick*, 831 F.2d at 750.  If the alleged debtor

demonstrates that there are factual and legal questions bearing on his alleged liability, a *bona fide*

dispute exists.  If there is a genuine issue of material fact, or a meritorious contention as to the

application of law to an undisputed fact, the involuntary petition must be dismissed. *In re*

*Tobacco Road Associates, L.P.*, 2007 WL 966507 (E.D. Pa. March 30, 2007).

It is important to note that the phrase "as to liability or amount" was added to §303(b)(1)

by the Bankrutpcy Abuse Prevention and Consumer Protection Act of 2005.  Congress provided

the following comments regarding these amendments:

> Sec. 1234. Involuntary Cases. Section 1234 of the Act amends the
> Bankruptcy Code's criteria for commencing an involuntary
> bankruptcy case. Current law renders a creditor ineligible if its
> claim is contingent as to liability or the subject of a bona fide

28

> dispute. *This provision amends section 303(b)(1) to specify that a creditor would be ineligible to file an involuntary petition if the creditor's claim was the subject of a bona fide dispute as to liability or amount. It further provides that the claims needed to meet the monetary threshold must be undisputed.* The provision makes a conforming revision to section 303(h)(1). Section 1234 becomes effective on the date of enactment of this Act and applies to cases commenced before, on, and after such date.

H.R. Rep. 109-31(I), 2005 U.S.C.C.A.N. 88 (emphasis added).    The primary purpose of disqualifying a creditor whose claim is subject to a *bona fide* dispute from filing an involuntary bankruptcy petition is to prevent such creditors from using involuntary petitions as a club to coerce the debtor to satisfy judgments when substantial questions may remain concerning the debtor's liability. *See In re Tikijian*, 76 B.R. 304, 313-14 (Bankr. S.D.N.Y. 1987) (citing S. 7618, 98th Cong. 2d Sess., June 19, 1984).

As a result of the above amendment, any dispute regarding the amount of the petitioning creditors' claims that arises from the same transaction and is part of the underlying claim renders the claim subject to a *bona fide* dispute. *In re Regional Anesthesia Assoc.*, P.C., 360 B.R. 466 (Bankr. W.D. Pa. 2007).    In this case, the Pennsylvania state court stayed any action on the judgment obtained by Lyon based on a dispute in connection with the judgment by confession raised by Rosenberg. [Ex. 50].    Substantial questions have been raised as to the validity and/or the amount of the confessed judgment against Rosenberg.  Because of such infirmities, a *bona fide* dispute exists precluding the Original Petitioning Creditors from filing the involuntary petition against Rosenberg.  The same rationale applies to Ashland Funding, which at best could have only acquired the same rights as DVI Funding had against Rosenberg.

The Settlement Agreement provided, in part, that:

> The Trustee [U.S. Bank, N.A.] asserts that the [Master] Leases are substantially in default and that there is now due the Agent [Lyon] the sum of $23,881,557.88 (the "Trustee's Claim").  The Lessees and Guarantors have disputed the Trustee's Claim and have

asserted defenses, counterclaims and offsets to the Trustee's
Claim.

The Trustee is specifically identified in the Settlement Agreement. The "Trustee's Claim" was

valued in the amount of $15,124,920.00 (referred to as the "Amortized Obligations"); and the

balance of the amount due was $8,756,637.88 (referred to as the "Unsecured Obligations"). As

noted above, the Limited Guaranty was capped at $7,661,945.00, the amount which Lyon

determined was the aggregate of Rosenberg's obligations under the original guaranty agreements

executed by him to secure payment of the Master Leases. The Limited Guaranty provided that

the guaranteed obligation would be reduced each month by the sum of $127,699.08 for each

payment made on account of the modified Master Leases.

After the entry of the Confession of Judgment, Rosenberg disputed, among other things,

the amount of the alleged debt owed to Lyon. [Ex. 51].  In its response to the Bucks County

Petition, Lyon admitted that the amount of the judgment was overstated by $58,351.40. [Ex. 52,

¶¶ 63-66].  Mr. Brier, who calculated the amount of the Confession of Judgment, testified that:

> At the time that I received the numbers from Brenda Ristau
> she had indicated that, that it was approximately 23
> payments of $100,000 received. The Settlement Agreement
> calls for a reduction of Mr. Rosenberg's guarantee for an
> amount of 127,000 and change for each payment that is
> made under the Settlement Agreement. And so I believe I
> used the number 23, for 23 payments that were provided by
> the bank, times the 127,000, to come up with an amount
> that reduced the original guarantee to this amount.

04/06/09 R. Brier Dep., pp. 119-120.  Thus, a total of $2.3 million had been received in

payments under the Settlement Agreement.

However, the amount of the total claims asserted by all the Original Petitioning Creditors

in the Original Involuntary Petition (as amended by the Second Amended Involuntary Petition)

changed considerably from the amount Lyon claimed in the Confession of Judgment against Rosenberg. In arriving to the new amount of $5,363,361, Mr. Brier testified the following:

> Q. Now, you had stated that you provided Mr. Pinel with the amounts that are listed on this petition. And where did you get these amounts from?
>
> A. The Settlement Agreement did not identify a particular amount relative to Mr. Rosenberg's guarantee to each of the DVI entities. So we -- we made some *assumptions* and put numbers in that we have since – we have since changed, because -- because it was a better way of tracing the guarantee from -- from the NMI entities through to the individual DVI entities.

Id., p. 160 (emphasis added). Mr. Brier also explained that:

> The difference is [due to] the pay histories that ... reflected that the number, the total amount of payments received was actually 1.8 million. So whereas it was previously reported to be approximately 2.3 million. So I think that results from some checks that were received and did not clear the bank. So the revised amount of 1.8 million was used to calculate, divided by 100,000 to calculate approximately18 payments to be used to reduce the guarantee as opposed to the 23 payments that we discussed earlier.

Id., pp. 168-169. [7]

The record evidence, however, is clear. The NMI entities actually made 21 payments under the Settlement Agreement. See Ex. 89 (NMI's cancelled checks) and respective summary. In using Mr. Brier's calculations, the guaranteed amount (which Rosenberg disputes) should have been reduced by $2.1 million (not $1.8 million) as indicated. Indeed, it is based on the actual numbers of payment submitted in evidence that the Original Petitioning Creditors and Ashland Funding now seek to amend the Original Involuntary Petition for the third time. See

---

[7]    It is also noteworthy to point out that the amount of the Confession of Judgment as to Rosenberg is $4,724,866.16, and that the total amount of the Petitioning Creditors' claim in the Original Involuntary Petition was $5,363,361.56, which was allocated in equal amounts of $1,001,833.96 among five of the

[C.P. 77]. According to the Original Petitioning Creditors, "[t]he Second Amended Petition was filed solely for purposes of: (a) correcting an *error in the calculation* of the amounts due and owing Petitioning Creditors; and (b) substituting Ashland, as a successor in interest, for DVI Funding, as a Petitioning Creditor." [Id., ¶ 5]. The third amendment is also required because "after filing of the Second Amended Petition, Petitioning Creditors realized that an *error had been made in the calculation of the amounts*." [Id., ¶ 6]. Mr. Brier now explains the difference by accounting for the above 21 payments, and that the correct total amount of the claim under the Limited Guaranty should be $4,980,264.32, and apportions to each of the Petitioning Creditors a particularized claim pro-rata after subtracting the amount allegedly owed to Ashland Funding.[8] See [C.P. 78, ¶¶ 6-9].

Notwithstanding the newest calculation, the amounts claimed in the Third Amended Involuntary Petition are still disputed. Rosenberg asserts he is still entitled to a credit of $58,351.40 (the "Credit"). This Credit arises from Lyon's separate agreement to provide the additional credit on account of an early payoff of two leases. See [Ex. 90]. Mr. Brier, however, takes the position that the credit should not be applied until the very last payment under the Settlement Agreement. [C.P. 78, ¶¶ 10-11]. He explains that, because of the default of the Settlement Agreement, Rosenberg is not entitled to receive such credit. [Id.] However, Mr. Brier testified previously in this case inconsistent with his latest position when he stated that he understood that the Credit should have been given to Rosenberg. [04/06/09, R. Brier Dep., p. 170, lines 12-22].

---

Petitioning Creditors (i.e., the DVI Receivables entities bearing roman numerals XIV, XVI, XVII, XVIII, and XIX), with the balance of $354,191.76 allocated to DVI Funding.

[8]    Mr. Brier calculates this new total amount of the Petitioning Creditors' claim by subtracting $2,681,680.68 (21 NMI payments multiplied by $127,699.08) from the total amount of the Limited Guaranty, $7,661,945.00.

In answering the Bucks County Petition, Lyon recognized such Credit, and admitted that the Confession of Judgment was overstated by the amount of such payoff Credit (despite the alleged default of the Settlement Agreement). The Original Petitioning Creditors cannot now take a different position in this proceeding as opposed to the one taken in the Bucks County Petition by Lyon, where Lyon recognized such Credit despite Mr. Brier's opinion to the contrary, which is contrary to Mr. Brier's prior sworn testimony. See, generally, [Ex. 52]. Accordingly, the Original Petitioning Creditors are judicially estopped from arguing otherwise. *See Fetterhoff v. Liberty Life Assur. Co.*, 282 Fed. Appx. 740 (11th Cir. 2008) (citing to *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)).

In conclusion, Rosenberg has put forth sufficient evidence to show that there are genuine issues of material fact, as well as legal questions, bearing upon not only the amount of the claim, but also the alleged liability of Rosenberg to Lyon, even if Lyon were the one to have directly signed the Original Involuntary Petition. Because these claims are subject to a *bona fide* dispute, the Original Petitioning Creditors cannot bring and prosecute this involuntary case. *See In re Regional Anesthesia Assoc., supra.* at 472. As more fully set forth in the Bucks County Petition, Rosenberg disputes both ***liability and the amount*** of the judgment by confession. He disputes any liability under the Limited Guaranty for anything other than out-of-pocket expenses which may be incurred by Lyon in connection with its collection efforts. See [Ex. 51]. He further alleges that the amount of the confessed judgment is inaccurate and in excess of any amount allegedly due under the Limited Guaranty. Accordingly, a *bona fide* dispute exists as a matter of law.

### III.    CONCLUSION

In conclusion, the Court finds that the Limited Guaranty only runs in favor of Lyon, and not any of the Original Petitioning Creditors, including Ashland Funding. The Court also finds

and concludes that the Original Petitioning Creditors and Ashland Funding are not the "real party in interest" to enforce the Limited Guaranty against Rosenberg. It is clear from the record in this case that the only real party in interest able to pursue claims against Rosenberg, is Lyon or the Trustee. Even if Lyon and/or the Trustee were able to go forward in this case, both wouldl nevertheless be holders of a single contingent claim which is subject to a *bona fide* dispute as to both liability and amount. Therefore, the Court concludes that this case should be dismissed with prejudice. It is

ORDERED AND ADJUGED as follows:

1.      The Motion to Dismiss is granted and the Involuntary Case is dismissed with prejudice.

2.      The Court retains jurisdiction to award Rosenberg his costs, reasonable attorneys' fees, compensatory damages, and punitive damages (if appropriate) which were caused by the filing of this involuntary case to which Rosenberg may be entitled under Section 303(i) of the Bankruptcy Code.

3.      The Court retains jurisdiction to determine Section 303(i) as well as to enter any such orders as may be appropriate.

# # #

Submitted By

Paul J. Battista, Esq.
Genovese Joblove & Battista, P.A.
Bank of America Tower
100 S.E. Second Street, 44th Floor
Miami, Florida 33131
Telephone: 305-349-2300
Facsimile: 305-349-2310
Email: pbattista@gjb-law.com

Paul J. Battista, Esq.
[Attorney Battista is directed to serve a copy of this Order upon all parties in this case].